Mr. Clerk, will you call the next case, please? Mr. Good morning, Your Honors. May it please the court, counsel. I'm representing the defendant in this case, Daniel Huizar. Mr. Huizar was convicted in a bench trial of first-degree murder and aggravated discharge of a firearm. Specifically, the judge found that on April 16, 2008, the defendant shot and killed Alfredo Lopez without lawful justification. The defendant was sentenced to a term of 45 years imprisonment. The two issues are raised on appeal. In the first issue, the defendant maintains that the state failed to disprove, beyond a reasonable doubt, the affirmative defenses of self-defense and defense of others. The defendant therefore asked this court in issue one to reverse his murder conviction and to remand this cause for sentencing for the offense of aggravated discharge of a firearm. Alternatively, in issue two, he submits that even if the state did prove the belief in self-defense. He therefore asked this court as an alternative in issue two to reduce his conviction to second-degree murder and to remand the cause for resentencing. Because these two issues are interrelated and they rely on the same evidence, my comments today will cover both issue one and issue two. The evidence at trial showed that in April of 2008, Daniel Huizar was 18 years old and he worked at a Subway restaurant located at one end of a strip mall in Joliet. On the evening of April 16, around 536 o'clock, he was inside the restaurant making sandwiches. His car was parked outside the restaurant and two of his At that time, five members of the vice lord's street gang came to the scene. Some of the vice lords testified they just went to the Subway to get a bite to eat, but one of them admitted that they went there to cause trouble for one or more rival gang members who they believed were working at the restaurant. The defendant himself was not a gang they approached the car. At that point, a police car came through the parking lot and the vice lords retreated back towards the other end of the strip mall. While the police car went on its way, the vice lords returned to the car. They yelled at the defendant's cousins to come out of the car. They wanted to fight. The cousins refused. The vice lords then proceeded to attack the automobile. One kicked it with steel-toed boots. Another picked up a rock and smashed one of the windows and apparently tried unsuccessfully to smash other windows. Two of the vice lords went over to the Subway, picked up a chair that was used to prop open the front door, returned to the car, and threw the chair at the car. The defendant testified that he saw some of these events transpiring through the windows of the restaurant and fellow employees inside the restaurant also told him about some of what they were seeing outside. The defendant testified that he was concerned for his cousin's safety. In fact, one of the cousins testified that during the attack on the car, he himself was scared to death. At that point, the vice lords retreated back towards the Subway. One of them actually started going into the restaurant, but his friends pulled him away and they began walking away. The defendant testified that when this individual started coming into the restaurant, he was afraid at that point that he himself was about to be attacked. So he went to the back of the store, obtained a handgun, walked out to the front of the restaurant and outside. He testified at that point he did not know where the vice lords were. He looked to his right, saw his cousins coming towards him, and heard one of them yell, shoot. He then turned to his left, saw one of the vice lords holding what looked to him to be a gun. He picked up his own gun and fired five shots. None of those shots struck any of the vice lords. But tragically, one of them hit and killed Alfredo Lopez, an innocent bystander who was going into a Walgreens at the other end of the mall with his two sons. This is undeniably a horrific situation, just a tragic situation, an innocent bystander being killed. But the defendant submits that the evidence here shows that when he fired his gun, he did so with an actual belief that he needed to use deadly force to protect himself and or his cousins. If that belief was reasonable, then this court should reverse the murder conviction and remand for sentencing for aggravated discharge of a firearm. If your honors believe that belief was unreasonable, then the correct verdict is second degree murder. Now, the defendant acknowledges that the Collins rational trier of fact standard applies here. But the defendant submits that unfortunately, based on her comments at the conclusion of the trial, it's apparent that the trial judge misrecollected certain testimony, placed undue reliance on other testimony, and therefore the defendant submits it was not a rational trier of fact. For example, she rejected the defense of defense of others based on her recollection that the defendant testified that when he fired his gun, he did so only because he was afraid that he was about to be shot. Well, the transcript of his testimony is very clear that he testified when he fired his gun, he did so because he was afraid that one of us were about to be shot, referring to himself and his cousins. And from the beginning of the incident, he expresses concern for his cousin's safety. So it appears the judge rejected this defense based on, unfortunately, a misrecollection of the evidence. Now, she also placed great reliance on the testimony of a man named Roger Mercer, who was in an automobile in the parking lot at the time of the incident. And she felt that his testimony established that there was only one person at the mall that day who was armed, and that was the defendant. Now, even if the defendant was the only person with a gun, under Illinois case law, that doesn't necessarily negate the defenses of self-defense and defense of others. But Mercer's testimony did not necessarily establish that the defendant was the only person with a gun. Mercer testified, he pulls into the parking lot, and at that time, he sees this attack on the car. He then sees the defendant walk out of the restaurant and start firing his gun. Mercer's focus is clearly on the subway restaurant, where the car is located, and then where the defendant is located when the defendant's firing his gun. He's not necessarily looking at the entire scene. Further, he testifies that when shots ring out, he's concerned for his own safety. And so he begins backing out of the parking lot, which I think is certainly a natural reaction under the circumstances. It's likely if he's backing out of the parking lot, he's probably looking behind him to make sure he doesn't plow into another car. He's probably going at a pretty good rate of speed. So again, he doesn't have the time to coolly and calmly survey the entire mall. And so he can't say with certainty that there's no other person armed with a weapon at that point. Further, Mercer testifies that at the time of the shooting, the vice lords are long gone. And the state relied on that testimony in closing argument to argue to the jury that any threat had dissipated before the defendant fired his gun. Well, that testimony by Mr. Mercer was actually contradicted by the testimony of the vice lords. Because they testified about their respective positions at the time they heard the defendant fire his gun. According to their testimony, they're at most a couple of stores away from the subway, not very far away at all. And even the state on appeal ultimately acknowledges, based on this testimony, that they were not far away at the time the defendant fired his gun. So Mercer's testimony that they're long gone is contradicted. Now, presumably the judge relied on Mercer because he appeared to be an objective witness, had no friend or enemy at the scene. You might say he had no dog in the fight. There was another witness who had no dog in the fight who testified that he was told that one of the vice lords was armed. Martin Gomez was called as a witness by the defense. He testified that at the time of trial he was in the county jail. He was in the county jail following this incident with the vice lords. And he had conversations with them. And he testified that one of them told him that he armed himself that day, went to the mall for the purpose of airing out some Latin kings, and then became involved in a shootout. Now, there's no showing that Gomez was a friend of the defendants or an enemy of the vice lords or a member of a gang that was a rival of the vice lords. Furthermore, of course, jailhouse informant's testimony is often suspect because they have an ulterior motive for testifying. They might have a deal to testify. Here he's testifying as a defense witness. So he certainly has no deal with the state and no showing of any inducement from the defense. So there's no reason in particular to disregard his testimony. Finally, the judge placed great reliance on a videotape, called it the most compelling evidence negating the affirmative defenses. And the state on appeal argues it was the most important evidence at trial and that it showed defendant did not act with lawful justification. Well, it was certainly compelling and probative and of value. But it is not dispositive as to the issue of lawful justification because it does not show what the defendant was looking at when he fired his gun. The videotape is taken from a surveillance camera located outside of the Subway restaurant. It shows the interior of the restaurant and the immediate exterior of the restaurant, but it does not show the entire mall. And so the videotape shows Mr. Huizar walking through the restaurant, walking outside, turning one way, turning the other, raising his gun and firing. Wasn't he at this point trying to hand the gun off to one of the cousins? Well, there was some testimony that he turned to one of his, certainly in his testimony he turned to his cousins and his cousins said shoot and then he turned around. The state argued that the videotape showed he was actually trying to hand it off. I've watched the videotape. I don't know that it's all that clear, but it's part of the record and certainly your honors can look at it and draw your own conclusion. In any event, the videotape shows Mr. Huizar shooting, but it doesn't show what he's looking at. It doesn't show any of the vice lords. So it does not negate his testimony that he thought he saw one of the vice lords holding a gun. Illinois case law recognizes that in cases, most cases like this where a defendant claims self-defense or defense of others, that the defendant is involved in a fast developing situation where he does not have time to coolly and calmly consider all of his alternatives. To consider the best course of action. There's pressure on the defendant. There is stress on the defendant. And Illinois case law specifically states a defendant in these circumstances is not expected either logically or legally to use inerrable judgment. Nor is he required to wait until blood is drawn. Although in this case, though blood was not drawn, there had been a very serious and unprovoked attack by these vice lords against the automobile  Defendant submits that all of these circumstances show that he did act with an actual belief in the need to use deadly force in self-defense or defense of his cousins. He therefore respectfully asks your honors to reverse his murder conviction and remand for sentencing on the offense of aggravated discharge of a firearm. Alternatively, to reduce from first to second degree murder and to remand for resentencing. Thank you very much. Thank you, your honors. Mr. Nicolosi. Good morning, your honors. May it please the court, counsel. Your honors, regarding the first issue, people submit that the defendant was proven guilty of first degree murder. And that the people did, in fact, disprove that he acted in the defense of himself or of other people at the scene on that day. The people submit that there are two important questions here. There are a number of different items that a defense must present in order to raise the issue of self-defense or the defense of others. One of them is whether or not there was actual force threatened against them. And number two, whether or not the danger of harm was imminent at the time. And the people would submit that they disproved that either of those were present. The people would absolutely agree, as I stressed in my brief, that the video in this case is the most important piece of evidence, just as the judge declared it was. There's one part of the videotape that I think is particularly critical here. At the 180743 mark of the video, the defendant can be seen exiting the subway. And beforehand, just as counsel suggests, and it's obviously not disputed, he was in the restaurant making sandwiches. But at the 43 second mark, 180743 mark, I don't know how I'm going to say that, he can be seen exiting the subway. At the 44 second mark, one second later, he is shown, and while it's not 100% clear, the people submit that it is clear that he tries to hand off this gun to his friends. Roger Mercer, who was the only truly unbiased observer of all these events from outside the restaurant, he testified that the defendant tried to hand off this gun. So that's at the 44 second mark. And then at the 45 second mark, one second after that, the defendant can be seen, for the first time, turning to the left. It is clear that up until that point, he does not look to the left, where supposedly the vice lords, this group of five, went. I shouldn't say supposedly, there's no question that they went that direction. That's one second after he tries to hand off the gun. So that's when he looks to the left for the first time. And then one second after that, at the 46 second mark, 180746, he raises his gun up and fires. Now, the people submit that that is just simply not enough time to assess any kind of situation, any kind of imminent threat, happening from north of the subway, where the Hollywood video is. That's where the testimony established that the group was approximately at or away from the Hollywood video. Do you have any testimony as to the actual distance? There wasn't much that I recall, at least in the briefs. I don't believe there was... Some were closer than others, the Walgreens video. Yes, I don't... I mean, you know, like 100 feet, 100 yards. I don't believe so. I don't remember. If I had to guess, I think there was a subway, and then there was one other store, I think a cell phone store. And then a Hollywood video. I think based on common knowledge, I think our own observation of these types of little scripts, that it probably couldn't have been more than... Probably couldn't have been less than 50 and any more than 100 feet, I would guess. And then there was a hallway. You're just speculating. Yeah, this is my speculation. I just wondered if there was something... I don't recall. I don't recall. But I think, Your Honor, I don't think it matters, even though the people kind of acknowledged in their brief that these five guys were in the vicinity. I don't think that's dispositive in any way of whether or not the threat... Any threat they posed was, quote, imminent. I think the fact... What goes to whether or not this threat is imminent has nothing to do with how close these guys are. It's what kind of threat are they posing, and is it imminent? And in this case, I don't believe there's any substantial evidence that these gentlemen, or the one gentleman in particular, had a gun, pointed a gun, fired a gun. I don't believe there's any. And the judge clearly didn't believe, which she was entitled to, that there was any evidence that there was another gun or any kind of threat that was imminent, regardless of how close they are. That doesn't matter. There's only two individuals that testified that a gun was pointed at the defendant... Reyes, Miguel, and Pedro Sanchez. Those were the four men that at the time of the shooting were right in front of the subway door. There's only two people that testified that there was a gun pointed at them. One was the defendant, of course, very self-serving and biased. Number two was Pedro Sanchez. And his testimony is really fascinating here. And his existence at the scene. On the video, you can clearly see Pedro Sanchez, who was also a subway employee. He was on the phone during this entire incident. And as the trial judge stated, and I'm going to reiterate here, because it's critical, he's pointing the gun the entire time this is going on. He's propping the door open while the defendant comes out, talking on the phone. He, neither Pedro, nor the defendant, nor Reyes, nor Miguel, on this video, act in any way like there is a gun pointed in their direction. In fact, the evidence was that Pedro... Reyes and Miguel were in the defendant's vehicle beforehand, of course. And the group of five was throwing rocks and kicking the car. And then they threw a chair. And Reyes and Miguel stayed in the car the whole time because at that point, there was clearly danger, and there was clearly a threat, and clearly was imminent. Those two men believed it. That's why they stayed in the car. But then at the time the defendant exits the subway, Reyes and Miguel, what do they do? They exit the car, and they walk towards the subway, towards where all this commotion was. Why on earth would these gentlemen exit their car if they believed that there was an imminent threat of any kind of danger? They clearly just exercised that they're going to stay in the car when there is the danger. They're going to leave when it's out. Why on earth? I can't imagine. And the judge couldn't imagine. I don't see how rational folks can imagine why these guys would come out and come towards where this confrontation was if there was any danger or any imminent threat at all. I think that's very strong evidence. But they're the defendant's cousins. He starts to come out of the store. Wouldn't it be reasonable that if they're concerned about his safety, that they're going to come to his aid? Your Honor, I can understand that, but what are they going to do at that point? The defendant didn't have to leave the subway. The defendant actually testified that he made the conscious choice to leave the subway. He was asked, so you didn't need to leave the subway, right? And he said, no, I didn't need to leave the subway. So there was clearly nothing going on here. Why would Reyes and Miguel come out if there was any confrontation? Clearly, when they were in the car, there was a confrontation. They didn't choose to come out and join or defend themselves or defend anybody else who might have been around. I think it absolutely stands to reason, based on the video and all the testimony, such as the testimony from Roger Mercer, who said these guys were long gone. And I think his testimony should be that that phrase, long gone, should be interpreted as the threat was long gone. Not that the gentlemen were long gone. I don't think there was enough time, as I acknowledged in my brief, for them to be truly long gone, two miles away. But I think he's testifying that the threat was long gone. They threw the rock, they kicked the car, they threw the chair, boom, they're gone. So at that point, they're gone, and the fact that Reyes and Miguel came out was further evidence that the threat was gone. I don't see any reason. They're not protecting the defendant because they actually get to the subway before the defendant. If the defendant was standing out there and maybe the five guys were kind of mulling in the area, then maybe it makes sense. Maybe. This is all hypothetical because these aren't the facts. Maybe Reyes and Miguel could come out to defend the defendant. But the fact is, there was nothing. There was no more confrontation in front of the subway. But didn't the vice or those gentlemen testify that they were within two doorways? Yeah, but Your Honor, they also testified that they were all walking away. Their testimony is almost uniform in that respect. They all testified that they were walking away. Juan Ornelas testified that the confrontation was over, that they were walking away. Sergio Garcia testified they were walking away. Roger Mercer, again, the only unbiased observer outside, he testified they were all walking away. Again, the only evidence that there was a gun was very flawed. Again, back to my original point, the defendant's testimony that there was a gun is, of course, biased. And Pedro's testimony, he testified that he saw one of the guys pointing a gun at them. And that was three years after the incident during the testimony. But there's another video in this case of Pedro Sanchez's interview with the detective the night of the shooting. And he never mentioned, I watched that video twice, he never mentioned that there was a gun pointed at him. I think that's a pretty important piece of evidence to not tell. Was he impeached with that when he testified? Oh, absolutely. They impeached him so he didn't recollect. I don't recall what he said. I know when we say long gone, but in the context of the rock throwing and the chair throwing, it seems that this is all within seconds, minutes, so that all of this is still embroiled in Mercer's testimony about being long gone. I don't know. He doesn't even see them. He testified that he's looking towards the defendant, so he can't see what's to his left if he's looking that way. I'm just trying to put it in context of how far apart these people are. I don't think anyone's saying that actually that his self-defense theory is reasonable as whether it was his belief and it was unreasonable, but he still had that belief. It seems like it's all very close in time, especially when you're advocating within three seconds he is exiting and shooting, but then to say, but everything else is long gone. Was it 20 minutes? Was it 30 seconds? Was it 10 seconds? How long gone is long? When you're saying that it took him three seconds to do that, how long were these other actions? Well, Your Honor, it actually took him three seconds after he exited the subway to start firing, but it had been five or six or maybe, I believe, even eight seconds until the time where the gentlemen were out of frame. The five guys were out of the frame of the camera that was facing out of the subway. In fact, we're talking about somewhere between eight, 10, 12 seconds from the time they're all gone to the time the shots fire. I would argue, I don't think this is entirely relevant, but 10, 12 seconds is actually a long time. And guys can, you can move and walk and run quite a distance in 10, 12 seconds. But I think the important point here, Your Honor, is not the time. I think it's the fact, again, whether or not this threat was imminent. I think that's all that matters. The time and whether or not these gentlemen were all within, let's say, 100 feet of each other, I don't think that's important at all. I think what's important at all is was there an actual threat. And in this case I don't believe there's any evidence of an actual threat. And again, I want to point to the part of the video which was stressed by the trial judge, and I'm going to stress it here, that right before defendant shoots there is no, you can see defendant Reyes, Miguel, and Pedro Sanchez, none of them are acting like there's a gun. None of them are acting like there's any kind of threat. If there was a gun, certainly somebody would have ran away or acted to run away. But the defense counsel in his brief argued that defendant was backpedaling while he was shooting because he was worried about being shot himself. I believe the video 100% belies that statement because the defendant is clearly shown stepping up and confidently firing. You're not going to do that if you're facing a gun or if there's any threat. You're going to act as if there was a gun. That's just a natural reaction, as if there was a gun pointing at you. None of these gentlemen clearly in this video acted as if there was a gun pointing at them. That's why the people submit that there was no danger of harm imminent to the defendant when he started shooting. Is shoot danger of harm or use of deadly force? Was there anything on the video that the vice courts did that would justify deadly force? Absolutely not, Your Honor. I don't believe throwing a chair at a car would necessitate deadly force. I don't believe throwing a rock through a window would necessitate that, barring other evidence, that the rock was thrown at somebody through the car. So what the defense wanted the court to find is that something happened after that incident ended. Absolutely. Yes, absolutely. In that respect, I think timing is absolutely important because when Reyes and McGill were in the car, sure, there were lots of threats there. There was lots of danger of harm to respond to. I think self-defense or defense of others necessarily indicates that there is some sort of justifiable reaction to a justifiable event. In this case, I don't believe there was an event. The trial judge clearly didn't believe there was an event. Again, this confrontation was over at the time the defendant exited the subway, and I think there's testimony and there's video evidence supporting that line of thinking. I believe that the video is very strong and that the evidence is strong here, that the defendant was properly proven guilty of first-degree murder, and that there was no justifiable reason to fire towards the vice lords. Just briefly regarding defendant's second argument that this conviction should be reduced to second-degree murder, the people believe that, again, based on all the evidence, counsel stated that the evidence here is kind of overlapping and deals with both issues, that the people submit that there was no actual belief that existed to justify the killing because, again, there was no competent evidence that there was another gun. There was more than enough competent evidence that the threat was gone and that all the evidence produced at trial comes to the conclusion that there was no actual belief that circumstances existed to justify this killing. Therefore, first-degree murder is absolutely the proper conviction in this case, and the people submit that this court should affirm the defendant's first-degree murder conviction and sentence. Thank you, Mr. Nicholson. Mr. Fisher? Your Honors, I think Justice O'Brien's comment about the time frame here is crucial and is spot on. This incident did not take a long period of time. It happened within a very short period of time. I'm sure the individuals involved in the incident felt that it was taking longer than what it really was, but this is really a matter of seconds. Counsel says, well, you can do a lot in 10, 12 seconds, but it's a very short period of time. In addition, it's interesting, as counsel says, well, the vice lords were walking away, so the threat had dissipated. The fact was, the entire incident shows they were really kind of back and forth, because initially they approached the car. The police car drives through the parking lot. The vice lords retreat. The police car goes on its way. The vice lords return. During the attack on the car, two of the vice lords retreat, grab the chair, come back towards the car. If we stop at that moment in time and the defendant had come out at that point with a gun, would his use, firing the weapon at that point, have been justified? I think it would have been justified in terms of defense of others. I don't think there was any indication of an attack on him at that point, but I think, you know, when you're using a rock against a window, and the counsel says, well, it wasn't thrown at one of the individuals in the car, but it could have gone through the window and struck him, and, of course, they're yelling at the cousins to come out. Well, as they come out, is he just going to drop the rock and then, you know, just rely on his fist, or is he going to beat the guy with the rock? And that's clearly going to be a deadly weapon, so I think that he would have had the right to use force in defense of his cousins at that point in time. Use of force is one thing. Escalating the force is another. And that's when I'm struggling. Right. And that's true, because obviously using the gun is deadly force. Again, using a rock, even a chair, I think that that can be a deadly weapon. It's a bludgeon. You strike someone, it can certainly cause great bodily harm or death. It can be great bodily harm. It can be sufficient to entail the responsive use of deadly force in self-defense or defense of others. So here the vice lords are back and forth, and again, they're a couple of scores away. There's no showing that they can't return and come back. The counsel argues that the defendant's cousins came out of the car, so they must have thought the threat had dissipated. I don't know that that's necessarily the case, but the important thing here is really what was in the mind of the defendant, Mr. Huizar. And again, he says that when he comes out of the store, he's not sure where the vice lords are. He looks to his right, then he looks to his left. He thinks he sees one of the vice lords holding a gun, and he reacts right away. Because of the short time frame, he did not have time to coolly and rationally consider his alternatives, but case law recognizes that's what happens in these situations, and again, the defendant's not expected legally or logically to use inerrable judgment. It's easy for us as lawyers and judges to look at this step-by-step to try and parse it out. Oh, here's what you should have done. Here's what you could have done. But the person finds himself in that situation. It's not so easy, and the law doesn't expect to react in a perfect way. It's interesting. The State on Appeal argues that he fired the gun too soon. In the trial court, the prosecutor argued he waited too long to fire the gun. Again, we're struggling with this circumstance, trying to parse out what he should have done, what would have been the best course. We can all probably agree on what may have been the best course of action, but this is happening in real time, and under the circumstances a young kid like this faced with what he's seen. Again, a completely unprovoked attack upon the auditorium. No indication that Mr. Huizar or his cousins did anything to set off this attack. It was the vice lords. Can we say that he overreacted maybe rationally? We could say that he went too far, but under the circumstances this evidence shows he had an actual belief, and it was either a reasonable belief or it was an unreasonable belief, and that's why the defendant respectfully has asked her honors in the alternative for the two different types of relief. Thank you. Thank you, Mr. Fisher, and thank you both for your argument today. We will take this matter under advisement and get back to you with a written disposition within a short time.